Case 23-3392, Ilia Kolominsky et al. v. Root Inc. et al. Argument not to exceed 15 minutes per side. Counsel, you may proceed for the appellant when ready. Good morning, Your Honors. Steve Hubachek, Robbins, Giller, Rudman and Dowd on behalf of the Plumbers Pension Trust Fund. I respectfully request four minutes for rebuttal. Your Honors, the District Court erred here by failing to adhere to the Omniclerc Court's determination that falsity or misleading statements must be evaluated from the perspective of a reasonable investor. From that perspective, the defendant's statements in the offering materials here created the misleading impression that Root's customer acquisition cost metric, their crucial metric, the CAC, was and remained low and constituted a competitive advantage for Root. Those facts were not true. In fact, in the quarter immediately preceding the IPO, Root's CAC skyrocketed to over $500, far more. You said and remained. Where in the statements do I find the and remained? Well, Your Honor, I think that that is the impression that was conveyed by three different statements that we've identified in the briefs. The warning that suggested that a rise in CAC was only a potential future event, not something that was occurring right now, thus creating the impression that it remained low. And also in the two statements that suggested, number one, that they were delivering CAC below that of traditional insurers and also that their business plan had resulted in CAC below. All of those statements individually and taken together create the impression that the CAC remained low as of the time of the IPO. Does it make any difference that, with regard to at least one of the things that you're claiming, does it make any difference that they gave a very specific time period that they were referring to with that specific CAC? Well, Your Honor, I think that Your Honor is referring, I think that the district court judge said that there was an express limitation on one of the has-resulted statements, but there really was no express limitation. They reported that from August of 2019 to August of 2020 that the number was 332. But they never said that the statements that I just referred to referred only to that time period. And in fact, we've argued both in terms of the implications of the purported risk warning and the two individual statements, both in terms of just a normal investor's reading and in terms of the grammatical rules that might apply to those particular statements, that both of them convey a current situation where the CAC continues to be low. And in fact, it was at that point as of the IPO as high as the typical insurer, the $500 to $700 range. And indeed, an analyst report that came out less than a month after the IPO said not only has the CAC gone up over $500, but we're projecting it to go close to $700 in the very near future. So that was clearly an inaccurate impression that was conveyed. Now, while this court hasn't... It wasn't a false statement as to the time period given. As to the time period given in a statement that we haven't challenged. And there was a one of the statements that we've challenged that gave accurate information about a two-year period. But what we're saying is that the statements we've actually challenged, the misleading risk warning, the presenting, the delivering CAC results below the average, and the fact that our business program has resulted in CAC below the average, those statements convey a present situation in which the CAC is still underneath what the traditional insurers are providing. Isn't the word delivering in the context of the sentence structure that it's in, doesn't it really match up with the main verb? And if the main verb was a past tense, then the delivering also really relates back to that tense, which was the 2018 to 2020 period? I would respectfully disagree. That's what the defendants have argued. And in our that no, in fact, that is a participial phrase. It acts as an adjective. And because of the position of the comma in the particular sentence, it modifies we in that sentence. It says we are the people that are delivering these great results. So I would respectfully disagree with that analysis. But ultimately, this is a question that's for a jury. It's how would a reasonable investor interpret that language? My friend has offered one view. We've offered another that's supported by the grammatical sources that we cited. But I don't think that there's any question but that a warning that says that our CAC may rise in the future or could rise in the future is misleading when it has already risen and had risen for a period of a quarter. So that was well established at the time that they spoke. So there's no grammatical tool that can be used to give that statement anything other than its actual meaning. Now, while this court hasn't addressed that kind of language in a precedential opinion, multiple circuits have found out, found that it's particularly misleading. And if I could just quote from the Fifth Circuit, to warn that the untoward may occur when the event is contingent is prudent. To caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit. That's the Rubenstein case from the Fifth Circuit. Both the Ninth Circuit in alphabet and the Second Circuit have already held that this type of statement is misleading as a misleading statement in and of itself. That's both in alphabet and set capital and in the Meyer decision. Now, while this court in an unpublished opinion in Bondali said that in the facts of that case that it did not qualify as a misleading statement, there the plaintiffs did not allege any facts showing that any investment risk had already materialized. Well, here, we've shown that the CAC had gone up to $500 by the time of the IPO. And in fact, two analyst reports that came out less than a month later identified that, identified the future prospects, and the next trading day, the stock dropped 10%. A week after that, then an 8K was filed that basically acknowledged that that was a situation and the stock dropped another 13.5%. So the situation in Bondali where there was no demonstration that in fact there was any risk to the investment is clearly distinguishable here because we have two stock drops of 10% and 13.5% that arose directly from the facts that were not revealed in the IPO. Now, with respect to the statement in the roadshow by Mr. Tim, the defendants have relied on that and the district court also mentioned it. There are both factual and legal problems with relying upon that statement to undercut plaintiffs' claims. Turning first to the legal issues, under Section 11, whether an investor has knowledge of the misleading nature of the statements is an affirmative defense. So it's not properly decided at a motion to dismiss stage as we are in here. And that's established in New Jersey Carpenters from the Second Circuit. This Court's decision in the Wright case makes clear that investors have no obligation to investigate to find out whether there is fraud. That is in the Section 12A2 context where it is a factual issue whether or not there was actual awareness. We have alleged that there was no actual awareness and we have also alleged that these facts were not revealed in the IPO, which is basically the factual predicate that Wright relied upon to say that no, that's not sufficient in order to grant summary judgment. Here, of course, we are at the motion to dismiss stage, so we are even earlier in the process. The other point with respect to Mr. Tim's comment is he said it was a short-term phenomenon resulting from experimentation on brand. Those lists are actually inaccurate. It wasn't a short-term problem. They were actually embarking upon a long-term investment plan. It wasn't experimentation on brand. It was, in fact, their own individual business plan. So not only is that statement factually flawed, it's also barred legally as a basis for granting a motion to dismiss under the New Jersey Carpenters, Wright, and Nomura cases, all from, two from the Second Circuit and one from this circuit. And finally, with respect to the delivering statement, once the defendants choose to speak to a particular issue, under Hellwig, they have an obligation to speak truthfully and fully. When they say that they have a program that is delivering those results and they don't reveal that, in fact, as of that moment, it wasn't delivering those results and hadn't for an entire quarter, that is misleading under the Hellwig standard. Nor is there any question that the district court also relied upon the fact that the statement didn't, that we didn't establish that there was a long-term CAC program. But as I've demonstrated already with the two stock drops, it was significant to the investors that, in fact, that there was a CAC increase, not only in the present but also expected in the future as well. That's clearly material to investors and materiality questions under TSC and this court's decision in Bridgestone are all questions for the jury, not questions to be resolved at this stage. If your honors don't have any further questions, I'd like to reserve my time for rebuttal. All right. Thank you, your honor. May it please the court, my name is Mike Galatis and I'm arguing on behalf of the defendants today. I'd like to start with what this case is not. The plaintiffs here have not alleged any sort of accounting mistake or accounting fraud. The plaintiffs have not alleged that there was any sort of inaccurate historical financial metric that was disclosed and the plaintiffs have not alleged that Root hid any risks from them. In fact, here the plaintiffs concede that Root had accurately disclosed the historical financial metric at issue, which is long-term customer acquisition cost, and the plaintiff does not contest that Root extensively disclosed risks, which include, for example, that investors should not rely on historical results as necessarily indicative of future results, that investors should be aware that customer acquisition cost varies and can fluctuate by season, and even that customer acquisition cost could rise substantially. Instead, the plaintiff here is focused on three sentences out of a 179-page registration statement for which there was 56 additional pages of unchallenged financial statements. The securities laws were meant to protect investors from purchasing securities based upon misinformation. They were not meant to allow an attorney to nitpick the grammar of three sentences out of thousands that are otherwise clear. Is it only grammar if, as I understand at least part of what is being complained of here, is that in a historically accurate statement, as of its termination date, that the defendants knew that those facts were not accurate thereafter, and that there's no duty to update at that point? You're correct. There is no duty to update once there is historical information that's accurate. Well, I mean, they're claiming that there is, so... Okay, so there is no duty to update, and that's black-letter law. There is no duty to update if the statements relate to historical accurate information, and here the plaintiff has conceded that the information was accurately disclosed in a historical sense. There is no duty to update in that circumstance, and that's black-letter law. To state a plausible claim here, the plaintiff would need to do three things. They would need to be able to state that the statements that the plaintiff challenges were about present-day customer acquisition costs, short-term customer acquisition costs, and then they would need to be able to explain that Roots' present-day short-term customer acquisition cost was higher than the average customer acquisition cost in the industry. They cannot do any one of those things, let alone all three, and therefore the decision below must be affirmed. I'd like to start at the end and focus on why they have not even alleged that Roots' present-day short-term customer acquisition cost was higher than the industry average, which their entire case hinges upon, and then I'd like to go back and look at the three statements and describe why they are either accurate historical statements or why they are future statements that are forward-looking and protected by the Bespeak's Caution Doctrine. According to the plaintiff's own allegations, Roots' present-day short-term acquisition cost was not higher than the industry average. In paragraph 94 of the amended complaint, which is at page ID 742, the plaintiff alleges that Roots' third quarter 2020 customer acquisition cost was $514. You take a look at page 80 of their amended complaint, which is at page ID 739. The plaintiff alleges that the average customer acquisition cost for Roots' direct insurance competitors was $700. And then if you look at the same paragraph, the plaintiff alleges that insurers in the industry typically spend between $500 and $800 for customer acquisition cost. So according to the plaintiff's own allegations, $514 is less than $700 and at the very bottom of the range of insurers, $500 to $800. So according to their own allegations, they have not even pled factual allegations that could plausibly allege that Roots' short-term, present-day customer acquisition cost was higher than the industry average. And therefore, you don't even need to look at the statements at all to figure out there's no claim here. Well, even if they weren't higher than, and I get it, it's a matter of degrees, isn't their point that kind of what was in the information that was provided to the investors was that it was way lower, like half of what the CAC would typically be for the industry norm? Is that irrelevant? Does it have to have been higher than in order for them to even get out of the gate? Great question. So the reason why it has to have been higher is because that's the allegation they've brought. They have said that the statements that were made were misleading because the customer acquisition cost was higher than the industry norm. That's the entire allegation. That's throughout their appeal papers. That's the reason we're focused on it. It could be misleading without being higher than the industry norm. I get it. That's what they argued. But it could still be misleading if there's a big difference between what the information was that was provided to investors and what the reality was, no? Setting aside their argument, it's not misleading here because what Root was discussing was its historic long-term customer acquisition cost. And it clearly stated as such. It said we're talking about the period from August 2018 to August 2020. It put bookends on it, talked about exactly what it was, and it said that that was on average $332. That was accurately disclosed and the plaintiffs concede as much. So there was nothing misleading about a historical statement. And again, black letter law states that if there is a, from this circuit, if there is an accurate historical financial statement, that cannot be the basis of a securities claim. And it cannot by law be misleading. So let me ask a hypothetical there. Because there's a bit of, for lack of a better term, kind of cuteness in there. Let's say that for that last quarter that is not encompassed within the 2018 to 2020 period, so the quarter that we're kind of talking about here, that the costs had skyrocketed. And they were actually, the CAC costs were $1,000. And all of the statements were the same. Your position would be the same? Well, let me explain why that's actually not the case. I can explain in a second why that's not the case, but I will tell you that under the law, if you've accurately disclosed your historic information, there is no duty to update and there is no duty to speak about something else. The law is clear that, the securities laws are clear from the Supreme Court in the matrix case. There is no duty to just speak about material terms. It's black letter law. Even if something's material to investors, if you have not spoken about it, in the prospectus, there is no duty to speak about it. So even under those circumstances, in that extreme, which is not the case here, there would be no duty to speak about it. And that's clear from the Supreme Court. But let me just also explain why that's not the case here. So two things. One, July and August 2020, two of the three months that are in the quarter they're talking about, were included in the long-term average. So they're only really talking about one month. And what they've alleged was that it was $514. Root accurately disclosed that customer acquisition cost varies, including in the very same sentence where we talked about the $332. Customer acquisition cost varies. And we said it varies by season. Well, one quarter is certainly within a season. One month is obviously within a season. And one month can certainly not demonstrate any sort of trend. It could be by season. It could be because it fluctuates. There's no trend that you can establish with one month. In addition, Root disclosed that it was increasing its marketing spend. It disclosed that throughout the prospectus. It talked about that it would be putting forth a national marketing campaign. It said it would be aggressively investing in that national marketing campaign. And the plaintiff alleges and acknowledges that customer acquisition cost is a simple ratio understood by the reasonable investor. It's marketing spend over customers acquired. If you've disclosed that you're aggressively increasing your marketing, then by definition, customer acquisition cost will increase in the short term. And the plaintiff concedes that. They say throughout their reply brief that customer acquisition cost was virtually certain to increase in the short term because of the increased marketing spend that was disclosed. So for a whole host of reasons, Judge Davis, I think that hypothetical is not what we have here. But again, I would come back to there is no duty to disclose material information. I'd like to briefly talk about the statements at issue and respond to some of the arguments that the other side was making. First, the first two statements they challenged are clearly referring to historical long-term customer acquisition cost. They focus on grammar. And I specifically heard them talk about the placement of a comma. First of all, if the securities laws, if you could bring a securities claim based on the placement of a comma, we would be afloat in securities cases. But in addition to that, the placement of the comma is irrelevant, as Judge Davis, as you asked, to the tense of the participle delivering. Simple grammar would demonstrate that you look at the main verb designed to figure out what the grammar is. And we've explained all of those grammar rules in our papers. But more importantly, what I would urge the court to do is to look at the registration statement. Look at page 120 of the registration statement, which is at page ID 1069. The first two statements that they're talking about are on the same page, in the same section, and actually right next to each other. There's one sentence, there's a list of bullets. The next sentence is the very beginning of the next paragraph. And then you have the disclosure that Judge Batchelder asked about. A disclosure that said, while customer acquisition costs can vary, including by season, here is what it is historically, from 2018 to August 2020, $332. Those two references are clear references to that historical long-term customer acquisition cost. But you don't just need to take my word for it, or the registration statement's word for it. You can take the plaintiff's own word for it. If you look back at their complaint, in paragraph 7 of their complaint, which is at page ID 725, the plaintiff said, and I quote, I'd like to read this full quote, because I think it's extraordinarily telling. Plaintiff said, the registration statement is replete with discussion about how Roots purported average customer acquisition cost of $332 for the period of August 2018 to August 2020, the two-year period before Root began exploring the IPO, was significantly lower than the amounts that traditional insurers incurred for customer acquisition. In their own words, that the registration statement was replete with that discussion of the historical long-term customer acquisition cost. And then with respect to the first two sentences that they challenge here, what they alleged in their complaint was that they were omissions. In other words, they were saying those two statements were talking about historical long-term customer acquisition cost, and were misleading because they did not talk about current customer acquisition cost, present day, short term. That is entirely different from what they're now arguing on appeal. They can't change their theory on appeal, but more importantly, what it shows is those two statements, even according to the plaintiff, were clear statements about historical long-term customer acquisition cost. And then if I can very briefly talk about the risk statement, which plaintiff's counsel also spoke about, that statement on its face was clearly referring to the future and long-term customer acquisition cost. How do we know that? Well, the sentence itself talked about the future plan to grow as a company. It talked about cultivate, the sentences immediately surrounding it talked about cultivating and maintaining relationships with app stores. The sentence appeared in the risk factors section of the registration statement, accompanied by cautionary language that investors were specifically told referred to forward-looking statements. Those were the words may and could, both of which appear in this very sentence they're challenging. And according to page 64 of the registration statement, which is at page ID 1013, those two words refer to forward-looking statements. Not only that, the registration statement also made clear that statements concerning Roots' ability to, quote, maintain and enhance our brand and reputation, end quote, and, quote, effectively manage the growth of our business, end quote, both of those are referring to forward-looking statements. That's what this risk statement was about. It was a forward-looking statement about long-term customer acquisition costs, and, therefore, it was not implying anything about short-term, present-day customer acquisition costs. And that was, therefore, protected by the Bespeak's Caution Doctrine. It was not implying anything about short-term, present-day customer acquisition costs. In fact, the risk could not have even materialized because it was talking about the long-term and because it was talking about the future. And where I would like to end is just, ultimately, this is consistent with every IPO. In every IPO, you have a situation where a company has to figure out when to cut off, when to cut the line. When do they have to disclose historical information? They have to decide what period to disclose that for. They then talk about what are their long-term plans and what are their risks. And here, Root disclosed long-term historical customer acquisition costs for a period that included up to the very month, August 2020, two months before the IPO closed, was open, and also disclosed their, that accurately, according to plaintiffs, disclosed the long-term plans and extensively disclosed risks. Your Honor, we think this is a straightforward case and that we ask you to defer the decision below. Unless there are any further questions, I finish my argument. Thank you. Thank you, Your Honors. I would like to start with refuting the claim that we never said that the actual CAC was over what was the typical. At paragraph 80 of the complaint, we say that it typically costs between $500 and $800 to acquire a new customer. So the $500 figure puts them in the average. The pitch that they make in their IPO is that we're delivering CAC costs that are well below the average. So it's plainly misleading. There was mention of the duty to update. Under this Court's decision in Hellwig, there is no duty to update if you make a statement that's true when you make it, and then later facts develop and make it not true. Then there's no duty to update in that situation. But here, when defendants spoke, as of the time of the IPO, they had already had a quarter in which their CAC had shot way up. And in fact, not only had it shot way up, but an analyst reported that in fact it was going to continue to go up close to the $700 figure that's at the far end of the actual typical range. So that's the situation that they were in at that time. So this isn't a question of the duty to update at all. I note that my friend doesn't address any of the circuit opinions that have come out and said that a statement structured exactly like their risk warning is in fact misleading and can justify a securities claim in and of itself. And that's alphabet, Meyer, set capital. My friend also doesn't address any of the other decisions from other circuits saying that these statements are so misleading, this type of risk warning, that in fact you can't use it for the Bespeak's Caution Doctrine or for the Safe Harbor. And examples of that are the Harmon decision, the Rombach decision, the Find What decision. Circuit after circuit after circuit has condemned this type of warning where in fact the risk has already been materialized as misleading in multiple contexts. And I think that this court should join them rather than creating a circuit split with those multiple decisions. My friend says that we're only talking about one month. And that sort of forgets what an average is. The average from August to August is supposedly $332. That doesn't mean that for the two months of the quarter that were included in that period that their figures were low too. In fact, if you look at the materials that the defendants have submitted, I believe that it was $266 was the CAC figure for the first two quarters of 2020. So all of a sudden that average goes from the 260s range up to 330. That suggests that something significant was going on in the quarter before the IPO was actually instituted. And in fact, that's how we got the $511 figure. So I don't think that we're talking about a one month figure. And whether it's a one month or three month, the bottom line is it had occurred as of the moment that this IPO was filed. And in fact, the defendants didn't disclose it. They, if I could use Judge Davis' term, kind of cutely hid that by talking about a different period of time without ever revealing the fact that when they said we are delivering these results, that in fact they were not. And with respect to the, my friend also complains about the grammar arguments. They are the ones that came in and raised various grammar rules. We responded and showed that there is a significant material issue for a jury to resolve as to how a reasonable investor would interpret these terms. Whether it's grammar rules or just a flat out reading of the actual statements, these statements were misleading. They created the impression that Root was still delivering the results that they had been touting throughout the IPO materials. And if you have no further questions, I would submit on that basis. Apparently not. Thank you so much, Your Honor. Thank you very much for your arguments. The case is submitted.